OPINION AND ORDER
JUSTICE SHEA
delivered the Opinion and Order of the Court.
¶1 Derrick Earl Steilman petitions for a writ of habeas corpus. Relying on Miller v. Alabama, 567 U.S. 460, 132 S. Ct. 2455 (2012), and Montgomery v. Louisiana, _ U.S. _, 136 S. Ct. 718 (2016), Steilman argues that his sentence of 110 years imprisonment, without the possibility of parole, for deliberate homicide with the use of a weapon, violates his Eighth Amendment rights because Steilman committed the offense when he was seventeen years old and the sentencing court failed to consider the special circumstances of his youth.
¶2 We address the following issues:
Issue One: Whether Miller and Montgomery apply to Montana’s discretionary sentencing scheme.
Issue Two: Whether Steilman’s sentence qualifies as a de facto life sentence to which Miller and Montgomery apply.
¶3 We hold that Miller and Montgomery apply to discretionary sentences in Montana. Regarding the applicability to de facto life sentences in Montana, the dispositive issue in this case is whether the unique circumstances of Steilman’s Montana sentence, when viewed in light of his eligibility for day-for-day good time credit and the concurrent sentence he is presently serving in Washington, qualifies as a de facto life sentence to which Miller’s substantive rule applies. We conclude that Steilman’s sentence does not qualify as a de facto life sentence, and therefore we do not reach the merits of whether the District Court properly considered the special circumstances of Steilman’s youth in this case as required by Miller. We deny Steilman’s *514 petition.
PROCEDURAL AND FACTUAL BACKGROUND
¶4 On the night of September 17-18, 1996, Steilman and his accomplice, Steven Francis, made a pact to kill someone as a show of trust before pursuing a criminal enterprise together that included a planned bank robbery. Steilman and Francis randomly crossed paths with Paul Bischke. Steilman and Francis demanded Bischke’s money, then struck him at least four times in the head, face, and arms with a crow bar, killing him. At the time he committed this murder, Steilman was 17 years and 323 days old, six weeks before his eighteenth birthday.
¶5 Steilman then moved to Tacoma, Washington, where nearly two years later, on or about September 10, 1998, he killed Jack Davis by beating Davis with a baseball bat. Within a week, Steilman and his then-girlfriend Colleen Wood were arrested in Butte in connection with the Washington homicide. Wood reported that Steilman took her to Davis’s apartment to show her Davis’s body. Another former girlfriend of Steilman’s told law enforcement that he admitted to killing someone and acted “as if it was nothing,” but she waited to contact law enforcement because Steilman threatened to kill her. The presentence investigation report provided Steilman dropped out of school before the tenth grade in large part due to drug and alcohol abuse, which started when he was thirteen. The report also provided that Steilman surrounded himself with “friends and acquaintances [who] were almost all using drugs and alcohol and living a criminal lifestyle to support their addictions.”
¶6 On October 5, 1998, the State charged Steilman with deliberate homicide. The prosecution commenced in Youth Court because Steilman was under eighteen when he committed the first murder. The State moved to transfer Steilman’s case to District Court. The Youth Court found: Steilman was seventeen years old when he committed the offense; probable cause existed; the delinquent act constituted deliberate homicide; the gravity of the offense and protection of the community required treatment beyond that afforded by juvenile facilities; the offense was committed in an aggressive and violent manner; and § 41-5-206(3) (1995), MCA, required transfer to the District Court.
¶7 Following the transfer to District Court, Steilman was returned to Washington for prosecution of Davis’s murder. He pled guilty to first degree murder and was sentenced to 260 months of incarceration plus 24 months for the use of a weapon, totaling 23 years, 8 months. As an *515 inmate of the State of Washington, Steilman was returned on a detainer order to be prosecuted in Montana for Bischke’s murder.
¶8 On October 1, 1999, Steilman pled guilty to deliberate homicide. On October 15, 1999, the District Court sentenced Steilman to the Montana State Prison for 100 years for deliberate homicide and 10 years for the use of a weapon, to run consecutively. The District Court reasoned that “the gravity and random nature of the murder ... [,Steilman’s] commission of another homicide, the punishment permitted by law and the possibility, or lack thereof, of rehabilitation” justified the 110-year sentence. The District Court also ordered Steilman ineligible for parole, remarking the “commission of a senseless, brutal, random homicide demonstrates that [Steilman] is not a suitable candidate for parole or other supervised release.”
¶9 Steilman’s Montana sentence is eligible for day-for-day good time allowance, which, contingent upon his behavior in prison, could make him eligible for release in 55 years. Section 53-30-105, MCA (1995); see Wilcock v. State, No. OP 11-0442, 362 Mont. 544, 272 P.3d 125 (table) (Sept. 13, 2011). Also, the District Court ordered Steilman’s 110-year prison term to run concurrent with his 23 years, 8 months Washington sentence. Under Washington law, Steilman is required to serve at least two-thirds of his sentence before he would be eligible for community release.
DISCUSSION
¶10 Section 46-22-101, MCA, provides “every person imprisoned or otherwise restrained of liberty within this state may prosecute a writ of habeas corpus to inquire into the cause of imprisonment or restraint and, if illegal, to be delivered from the imprisonment or restraint.” Article II, Section 19 of the Montana Constitution guarantees the writ of habeas corpus shall never be suspended. The writ of habeas corpus is available to challenge the legality of the sentence; however, it is not available to attack the validity of the conviction or sentence of a person who has been adjudged guilty of an offense in a court of record and has exhausted the remedy of appeal. Sections 46-21-101(1), -22-101(2), MCA, Rudolph v. Day, 273 Mont. 309, 311, 902 P.2d 1007, 1008 (1995). The exception for filing habeas petitions to challenge a facially invalid sentence is generally limited to invalidity that “stems from a rule created after time limits for directly appealing or petitioning for postconviction relief have expired.” Beach v. State, 2015 MT 118, ¶ 6, 379 Mont. 74, 348 P.3d 629 (citing Lott v. State, 2006 MT 279, ¶ 22, 334 Mont. 270, 150 P.3d 337). A petitioner who successfully challenges a sentence by way of habeas corpus, but not the underlying conviction, *516 is not entitled to be released, but only to be resentenced. Lott, ¶ 23. If the illegal portion of a sentence “affects the entire sentence” and we are unable to discern what the district court would have done if it had properly applied the law, we remand for resentencing. State v. Heath, 2005 MT 280, ¶ 7, 329 Mont. 226, 123 P.2d 228.
¶11 Issue One: Whether Miller and Montgomery apply to Montana’s discretionary sentencing scheme.
¶12 The State argues that Steilman’s sentence is not facially invalid and habeas relief is not available because the sentencing court had the constitutional authority to impose the sentence. The State contends that Miller’s rules only apply to sentencing schemes mandating life without parole for juvenile offenders, and that the “mandatory sentencing rule has no application in Montana.” See Beach, ¶ 36. The State further contends that Miller merely requires the sentencing court to follow a certain process before imposing a life without parole sentence on a juvenile, and does not “foreclose a sentencer’s ability to make that judgment in homicide cases.” Miller, 567 U.S. at 480, 132 S. Ct. at 2469. According to the State, under Miller a sentencing court retains the constitutional authority to sentence a juvenile to life without parole; therefore, as a matter of law, such a sentence cannot be facially invalid under Lott. See Beach, ¶ 38; Lott, ¶ 22. We disagree, and are satisfied that Steilman sufficiently calls into question the facial validity of his sentence because Montgomery announced that Miller applies retroactively and effectively overruled our holding in Beach. Montgomery, _ U.S. at _, 136 S. Ct. at 734.
¶13 The Eighth Amendment to the United States Constitution and Article II, Section 22 of the Montana Constitution provide: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” The U.S. Supreme Court dictates that courts must interpret the Eighth Amendment “according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design” and refer to “ ‘the evolving standards of decency that mark the progress of a maturing society’ to determine which punishments are so disproportionate as to be cruel and unusual.” Roper v. Simmons, 543 U.S. 551, 560-61, 125 S. Ct. 1183, 1190 (2005) (quoting Trop v. Dulles, 356 U.S. 86, 100-101, 78 S. Ct. 590, 598 (1958) (plurality opinion)). The Eighth Amendment prohibition against cruel and unusual punishment “flows from the basic ‘precept of justice that punishment for crime should be graduated and proportioned to the offense.’ ’’ Roper, 543 U.S. at 560, 125 S. Ct. at 1190 (quoting Atkins v. Virginia, 536 U.S. 304, 311, 122 S. Ct. 2242 *517 (2002)). “While in practice the concept of proportionality does not affect most sentences, proportionality bears on the harshest types of punishments when an Eighth Amendment challenge is raised.” Beach, ¶ 8 (citing Ewing v. California, 538 U.S. 11, 123 S. Ct. 1179 (2003)) (internal citations omitted).
¶14 Through a series of decisions over the last dozen years, the U.S. Supreme Court has made clear that “children are constitutionally different from adults for purposes of sentencing” under the Eighth Amendment. See Montgomery, _ U.S. _, 136 S. Ct. at 732-733 (holding that Miller’s procedural requirements to consider characteristics of youth when sentencing juvenile offenders provides a substantive rule that applies retroactively); Miller, 567 U.S. at 470-71, 132 S. Ct. at 2463-64 (holding the Eighth Amendment forbids a sentencing scheme that mandates life without the possibility of parole for juvenile offenders); Graham v. Florida, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010) (holding the Eighth Amendment categorically forbids sentences of life without parole for juveniles convicted of nonhomicide offenses); Roper, 543 U.S. at 575, 125 S. Ct. at 1198 (holding capital punishment unconstitutional for juvenile offenders).
¶15 The U.S. Supreme Court identified three primary differences between adult and juvenile offenders:
First, children have a “lack of maturity and an underdeveloped sense of responsibility,” leading to recklessness, impulsivity, and heedless risk-taking. Second, children “are more vulnerable to negative influences and outside pressures,” including from their family and peers; they have limited “control over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievable depravity.”
Montgomery, _ U.S. at _, 136 S. Ct. at 733 (quoting Miller, 567 U.S. at 471, 132 S. Ct. at 2464) (alterations, citations, and some internal quotation marks omitted). “These differences render suspect any conclusion that a juvenile falls among the worst offenders.” Roper, 543 U.S. at 570, 125 S. Ct. at 1195. The Court admitted the difficulty, even for expert psychologists, “to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Roper, 543 U.S. at 573, 125 S. Ct. at 1197. The Court acknowledged the inherent “differences [that] result from children’s ‘diminished culpability and greater prospects for reform,’ ” and that “ ‘the *518 distinctive attributes of youth diminish the penological justifications’ for imposing life without parole on juvenile offenders.” Montgomery, _ U.S. _, 136 S. Ct. at 733 (quoting Miller, 567 U.S. at 461, 132 S. Ct. at 2465). The Court reiterated that “youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole.” Miller, 567 U.S. at 473, 132 S. Ct. at 2465. In so doing, Miller barred life without parole for all but the rarest juvenile offenders whose crimes reflect permanent incorrigibility. Montgomery, _ U.S. at _, 136 S. Ct. at 734.
¶16 The Miller Court outlined five factors of mandatory sentencing schemes that “prevent the sentencer from considering youth and from assessing whether the law’s harshest term of imprisonment proportionately punishes a juvenile offender.” Miller, 567 U.S. at 461-62, 132 S. Ct. at 2458.
Mandatory life without parole for a juvenile [1] precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. [2] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. [3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. [4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And [5] finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
Miller, 567 U.S. at 477-78, 132 S. Ct. at 2468. Even though the Miller Court did not categorically bar sentences of life without parole for juveniles convicted of a homicide offense, the Court required sentencing judges “take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.” Miller, 567 U.S. at 480, 132 S. Ct. at 2469.
¶17 Steilman argues that the aspect that is cruel and unusual for juvenile offenders is the sentence of life without parole itself, not whether the scheme under which the sentence is imposed is mandatory. We agree. Discussing its rationale for treating juvenile offenders differently from adult offenders, the U.S. Supreme Court *519 explained that “a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect ‘irreparable corruption.’ ” Montgomery, _ U.S. at _, 136 S. Ct. at 726 (quoting Miller, 567 U.S. at 480, 132 S. Ct. at 2469). The Court further noted, “Miller ... did more than require a sentencer to consider a juvenile offender’s youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of ‘the distinctive attributes of youth.’ ” Montgomery, _ U.S. at _, 136 S. Ct. at 734 (quoting Miller, 567 U.S. at 472, 132 S. Ct. at 2465). In the same vein, the Seventh Circuit Court of Appeals appropriately reasoned: “The relevance to sentencing of‘children are different’ also cannot in logic depend on whether the legislature has made the life sentence discretionary or mandatory; even discretionary life sentences must be guided by consideration of age-relevant factors.” McKinley v. Butler, 809 F.3d 908, 911 (7th Cir. 2016). We conclude that Miller’s substantive rule requires Montana’s sentencing judges to adequately consider the mitigating characteristics of youth set forth in the Miller factors when sentencing juvenile offenders to life without the possibility of parole, irrespective of whether the life sentence was discretionary.
¶18 Issue Two: Whether Steilman’s sentence qualifies as a de facto life sentence to which Miller applies.
¶19 The State argues that because Montana law provides a distinction between sentences of life imprisonment, term-of-years, and death, a term-of-years sentence cannot become a de facto life sentence and equate to a de jure life imprisonment under Montana law. See § 45-5-102(2), MCA. The State contends Steilman’s term of 110 years as a sentence is not the same as a life imprisonment sentence, and Miller only applies to life imprisonment. The State further contends no standard exists to determine how long a term-of-years must be before it becomes the equivalent of life imprisonment, and any term-of-years could be equivalent to life without parole if the offender dies while incarcerated. We disagree.
¶20 The same principles that make Miller applicable to Montana’s discretionary scheme similarly apply to a term-of-years sentence that is the practical equivalent of life without parole. A strict application of the State’s argument would mean that a sentence that inarguably would not allow for the offender to ever be released could not be considered a life sentence so long as the sentence is expressed in years. Logically, the requirement to consider how “children are different” cannot be limited to de jure life sentences when a lengthy sentence *520 denominated in a number of years will effectively result in the juvenile offender’s imprisonment for life. See McKinley, 809 F.3d at 911; State v. Zuber, 152 A.3d 197 (N.J. 2017); People v. Nieto, 52 N.E.3d 442 (Ill. App. Ct. 2016); Kelly v. Brown, 851 F.3d 686 (7th Cir. 2017); State v. Ramos, 387 P.3d 650 (Wash. 2017); State v. Cardeilhac, 876 N.W.2d 876 (Neb. 2016); People v. Cervantes, 9 Cal. App. 5th 569 (Cal. Ct. App. 2017); Hayden v. Keller, 134 F.Supp.3d 1000 (E.D.N.C. 2015).
¶21 In Graham, upon which the Miller Court relied heavily, the Court reasoned that sentencing a juvenile non-homicide offender to life without parole violates the Eighth Amendment’s rule against disproportionate sentences because it denies the juvenile offender a chance to demonstrate growth and maturity. Graham, 560 U.S. at 73, 130 S. Ct. at 2029. The Graham Court did not focus on the precise sentence meted out, nor did it require the state to “guarantee the offender eventual release, but if [the state] imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.” Graham, 560 U.S. at 82, 130 S. Ct. at 2034. Consonantly, the Montgomery Court dictated that children, who are constitutionally different from adults in their level of culpability, must be given the opportunity to show their crime did not reflect irreparable corruption, and if redeemable, their hope of release must be restored. Montgomery, _ U.S. at _, 136 S. Ct. at 736-37. As such, the rule in Montgomery “draws ‘a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption’ and allows for the possibility ‘that life without parole could be a proportionate sentence only for the latter kind of juvenile offender.’ ” Tatum v. Arizona, _ U.S. _, _, 137 S. Ct. 11, 12 (2016) (Sotomayor, J., concurring) (quoting Montgomery, _ U.S. at _, 136 S. Ct. at 734). Montgomery and Graham illustrate the U.S. Supreme Court’s inexorable evolution recognizing that all but the rarest juvenile offenders be given an opportunity for redemption and a hope of release, which a sentence of life without parole cannot provide. As it pertains to the specific sentence imposed on Steilman, however, our analysis cannot end here.
¶22 The dispositive question remaining is whether the sentence imposed on Steilman does, in fact, constitute a de facto life sentence that triggers the Eighth Amendment protections set forth in Montgomery and Miller. We begin with the practical application of Steilman’s sentence. As the State points out, because Steilman is eligible for day-for-day good time credit, his 110-year sentence allows for his release after serving only 55 years, contingent upon his behavior *521 in prison. Section 53-30-105, MCA (1995) (repealed 1997). Let us assume, for the sake of argument, that a sentence imposed upon a twenty-one year old man, which allows for the possibility of release in 55 years, constitutes a de facto life sentence. We nevertheless cannot ignore the reality that Steilman’s Montana sentence was imposed to run concurrent with the Washington sentence he was already serving for the murder he committed as an adult in Washington, thus giving Steilman credit towards his Montana sentence for time served on a wholly unrelated murder in Washington.
¶23 The Eighth Amendment prohibition against cruel and unusual punishment “flows from the basic ‘precept of justice that punishment for crime should be graduated and proportioned to the offense.’ ’’ Roper, 543 U.S. at 560, 125 S. Ct. at 1190. After factoring in both the day-for-day good time credit to which Steilman is eligible, and the credit he gets towards his Montana sentence while serving his concurrent sentence in Washington, Steilman could potentially serve as little as 31.33 years exclusively attributed towards Bischke’s murder. Had the Montana District Court imposed a sentence that allowed for the possibility of Steilman’s release after serving as little as 31.33 years, but ordered the sentence to run consecutive to his Washington sentence, Steilman would be hard pressed to argue that such a sentence was disproportionate to the horrific crime he committed. In that circumstance, such a sentence would simply reflect a proportionate sentence independently imposed for a crime independently committed. And yet this is precisely the practical effect of the sentence Steilman actually received. Steilman was not entitled to a concurrent sentence in this case. Nevertheless, the District Court, in its discretion, elected to run his Montana sentence concurrent with his Washington sentence, inuring considerably to Steilman’s benefit. If we were to ignore the practical effect of Steilman’s sentence, we would be allowing him to reap that benefit while disregarding it for purposes of assessing the proportionality of his Montana sentence. Determining whether a sentence is cruel and unusual does not require us to ignore reality.
CONCLUSION
¶24 The combination of the good-time credit to which Steilman is eligible and the amount of his sentence that will be discharged while serving a sentence on a wholly unrelated crime leads us to conclude that Steilman’s sentence does not trigger Eighth Amendment protections under Montgomery, Miller, and Graham. Therefore, we do not reach the question of whether the District Court failed to *522 adequately consider Steilman’s youth under Miller and Montgomery when sentencing him.
ORDER
¶25 The petition for writ of habeas corpus is DENIED.
DATED this 13th day of December, 2017.
CHIEF JUSTICE McGRATH, JUSTICES BAKER and RICE concur.