

FILED

Jun 27 2019, 6:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Katherine Province
Anne C. Kaiser
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Donnell Wilson, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent* | June 27, 2019 <br><br> Court of Appeals Case No. 18A-PC-3041 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br> The Honorable Kathleen A. Sullivan, Magistrate <br><br> Trial Court Cause No. 45G01-1608-PC-7 |

**Baker, Judge.**

[1] Donnell Wilson grew up in an urban war zone and became a gang member at a young age. He was sixteen years old at the time he committed murder and other crimes. The trial court sentenced him to an aggregate sentence of 181 years, which is a de facto sentence of life without parole. Wilson's trial counsel presented no evidence at his sentencing hearing, and counsel's sentencing argument takes up only 2 pages of a transcript that spans over 700. The sentencing hearing did not include evidence regarding Wilson's youth and its attendant characteristics or Wilson's particular characteristics; as a result, it did not comply with relevant caselaw.

[2] On post-conviction, Wilson argued that he received the ineffective assistance of trial counsel. We agree. We therefore reverse and remand with instructions to vacate Wilson's sentences and to hold a new sentencing hearing that complies with *Miller v. Alabama*, 567 U.S. 460 (2012).

# Facts[1]

## *Wilson's Background*

[3] Wilson, who was sixteen years old at the time he committed the crimes at issue in this appeal, grew up in Gary. He was the sixth of twelve children and was intelligent and a role model to his siblings and classmates. Glen Park, the neighborhood in which Wilson grew up, was an "urban war zone." PCR Ex. 8

---

[1] We held oral argument in Indianapolis on June 10, 2019. We thank counsel for their outstanding written and oral presentations.

p. 5. His mother did not allow her children to play outside and taught them to fall to the floor or go to the basement if they heard gunshots. Wilson was under threat of serious injury and death nearly every day. When he was seven or eight years old, he saw another child get shot in the head. On another occasion, he saw two friends get shot. His home was firebombed on one occasion and shot at multiple times; he was present when the home was firebombed. Wilson had been shot on at least two occasions.

[4] Growing up in such an area caused Wilson to develop a "war zone mentality" characterized by "hypervigilance," which is manifested as extreme sensitivity to potential threats and a high probability of responding to perceived threats with aggression. PCR Ex. 6 p. 7. As a result of his surroundings, Wilson developed post-traumatic stress disorder (PTSD) at a young age.

[5] As is common for individuals living in urban war zones, Wilson became affiliated with several gang groups, including the Get Fresh Boys and Tre 7. Glen Park and its gangs were rivals with the gangs of another Gary neighborhood.

### The Crimes and Direct Appeal

[6] On March 17, 2013, Wilson was sixteen years old. The facts, as described by this Court in Wilson's direct appeal, are as follows:

> In March 17, 2013, fifteen-year-old Pecolla Crawford was walking home with her brother Jonte Crawford, their cousin Jordan Hendrix, and Wilson, who was dating Pecolla at the time. Hendrix was in town visiting and staying with Pecolla and

Jonte. While the group was walking, they encountered fifteen-year-old Derrick Thompson, at which point Jonte and Wilson began harassing and intimidating Thompson, flashing the guns they were carrying, and asking Thompson what part of town he was from. Wilson was carrying a silver .357 revolver and Jonte had a black handgun. Jonte then told Thompson to give him his phone and Wilson made a reference to Tre 7, a local gang, and grabbed Thompson's Dre Beats headphones off of his head. The two then left Thompson and continued walking with Pecolla and Jordan.

The group then encountered brothers Shaqwone Ham and Charles Wood. Jordan, who was friends with the brothers, exchanged greetings and continued walking with Pecolla. Pecolla then heard Jonte and Wilson begin to argue with the brothers. Wilson said, "Y'all looking for me? I'm in your hood." A couple seconds later, Wilson shot Wood in the head. As Ham attempted to run, Jonte shot him several times. Both Ham and Wood died as a result of their injuries. Shortly after the incident, police received calls from Thompson and a nearby resident who witnessed the shooting. Jonte and Wilson were subsequently arrested and Thompson's phone and headphones were recovered from Jonte at the police station.

Ham and Wood were members of the Dolla Boys gang, which was a subset of the larger Bottom Side gang. Wilson was part of several interrelated gangs including the Get Fresh Boys, Tre 7, and Glen Park Affiliated, all of which were at odds with the Bottom Side gangs. Wilson had posted several gang related comments on his Twitter account including, "up for da bottom," referring to people from Bottom Side, "Tre 7 got da mac," "Yea ima freshboy but im riding thru da bottom," and "Claim da bottom u get whacked." On March 12, 2013, Wilson tweeted "[If I] see a dolla he betta duck," and on the day of the murders, he tweeted, "GlenPark or get shot!!!"

*Wilson v. State*, 30 N.E.3d 1264, 1266 (Ind. Ct. App. 2015) (internal citations and footnote omitted), *trans. denied*. The State charged Wilson with two counts of murder, Class B felony armed robbery, and Class D felony conspiracy to commit criminal gang activity, also seeking criminal gang activity sentence enhancements for the murder and robbery charges.

[7]     Wilson's jury trial began on June 30, 2014. The State sought to introduce Wilson's tweets and Wilson objected; the trial court overruled the objection and admitted the evidence. At the close of the trial, the jury found Wilson guilty as charged, including the criminal gang activity sentence enhancement. The trial court sentenced Wilson to consecutive terms of 60 years for one murder conviction, 55 years for the second murder conviction, 6 years for armed robbery, and 2 years for conspiracy to commit criminal gang activity, with an additional 60 years added pursuant to the criminal gang activity sentence enhancement, for an aggregate sentence of 183 years imprisonment.

[8]     Wilson appealed, arguing that (1) the trial court erred by admitting the tweets into evidence; (2) Wilson's conviction for conspiracy to commit criminal gang activity should be vacated because it violated the prohibition against double jeopardy; and (3) the trial court erred by excluding Wilson from a portion of trial because of an outburst. This Court found in favor of Wilson on the second issue, vacating his conspiracy conviction based on double jeopardy principles and remanding to the trial court for a sentence reduction. This Court ruled against Wilson on the other two issues. The end result of the direct appeal was

an aggregate sentence of 181 years imprisonment. Our Supreme Court denied Wilson's petition to transfer.

### *Post-Conviction Relief*

[9] On August 11, 2016, Wilson filed a pro se petition for post-conviction relief; it was later amended by counsel on February 10, 2017, and again on August 18, 2017. Wilson argued that his sentence is unconstitutional pursuant to United States Supreme Court precedent; that the criminal gang enhancement is unconstitutional as applied to him; and that he was denied the effective assistance of trial and appellate counsel.

[10] The post-conviction court held an evidentiary hearing on March 6-8, 2018. Trial and appellate counsel each testified at the hearing. Trial counsel stated that he met with Wilson five to eight times, spending forty-five to ninety minutes with him each time. Wilson rejected a plea offer that would have resulted in an aggregate sentence of 100 years imprisonment. Trial counsel believed that trial would be an uphill battle based on eyewitness testimony and Wilson's tweets; counsel also knew that if convicted, Wilson would receive consecutive sentences for each murder conviction because that trial judge typically sentenced defendants in that manner. Counsel spoke with Wilson's family but no one told him that Wilson had any mental health issues; therefore, counsel did not consider hiring a mental health expert. Wilson's presentence investigation report stated that Wilson did not have any mental health issues.

[11]    Appellate counsel testified that at the time of Wilson's direct appeal, he was not familiar with *Miller v. Alabama*, 567 U.S. 460 (2012), and that he did not consider challenging the constitutionality of Wilson's sentence. He considered raising an abuse of discretion argument regarding the sentence but decided against it because the trial court mentioned Wilson's young age many times during sentencing. Counsel admitted that he should have raised an argument that the sentence was inappropriate pursuant to Indiana Appellate Rule 7(B).

[12]    As part of the post-conviction proceedings, forensic psychologist Dr. Charles Ewing conducted a psychological evaluation of Wilson in August 2017. In his opinion, Wilson should have had a competency evaluation before going to trial because of his prior mental health history[2] and the fact that he had only completed the eighth grade at the age of sixteen. Dr. Ewing diagnosed Wilson with PTSD, concluding that he had been suffering from PTSD since he was a young child. Dr. Ewing testified that Wilson's life experiences left him not fully capable of appreciating the consequences of his behavior and that Wilson was immature for his age, impulsive, poorly educated, unsocialized, and mildly paranoid. In Dr. Ewing's opinion, Wilson's chances of recidivism were high until he reached the age of twenty-five, but after that age, Wilson was a good candidate for rehabilitation.

---

[2] Dr. Ewing later acknowledged that Wilson had only been seen by a mental health professional once and that he had no formal diagnoses aside from "behavioral problems" until Dr. Ewing diagnosed him with PTSD. PCR Tr. Vol. II p. 85.

Developmental psychologist Dr. James Garbarino testified that at the time of the murders, Wilson was in a state of hypervigilance. Wilson told Dr. Garbarino that the victims had not pulled their guns out but that he anticipated that they would and took a preemptive action to protect himself. In Dr. Garbarino's opinion, gang membership should be a mitigating factor because gangs draw their members into committing crimes. Dr. Garbarino believed that Wilson's prospects for rehabilitation were good.

On November 21, 2018, the post-conviction court denied Wilson's petition for post-conviction relief. Wilson now appeals.

# Discussion and Decision

The general rules regarding the review of a ruling on a petition for post-conviction relief are well established:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). "When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* To prevail on appeal from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear

error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (quotation omitted).

*Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014).

[16] While Wilson raises multiple arguments on appeal, we find one dispositive. Specifically, he argues that the post-conviction court erred by determining that he did not receive the ineffective assistance of trial counsel with respect to his sentencing hearing.

[17] A claim of ineffective assistance of trial counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant such that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability arises when there is a 'probability sufficient to undermine confidence in the outcome.'" *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). "Failure to satisfy either of the two prongs will cause the claim to fail." *Gulzar v. State*, 971 N.E.2d 1258, 1261 (Ind. Ct. App. 2012).

### *Miller v. Alabama*

[18] This issue will turn on the United States Supreme Court's decision in *Miller v. Alabama*. In *Miller*, two fourteen-year-old defendants were convicted of murder and sentenced to life imprisonment without the possibility of parole; in neither case did the sentencing authority have discretion to impose a different punishment. 567 U.S. at 465. The *Miller* Court noted two relevant lines of cases—one in which it held that the Eighth Amendment bars capital punishment for children because of juveniles' "lesser culpability," and the other in which it prohibited the mandatory imposition of capital punishment. *Id.* at 470.

[19] The Court explored the differences between juveniles and adults in depth:

> *Roper*[3] and *Graham*[4] establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." *Graham*, 560 U.S., at 68, 130 S.Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S.Ct. 1183. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from

---

[3] *Roper v. Simmons*, 543 U.S. 551 (2005).

[4] *Graham v. Florida*, 560 U.S. 48 (2010).

horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570, 125 S.Ct. 1183.

Our decisions rested not only on common sense—on what "any parent knows"—but on science and social science as well. *Id.,* at 569, 125 S.Ct. 1183. In *Roper,* we cited studies showing that "'[o]nly a relatively small proportion of adolescents'" who engage in illegal activity "'develop entrenched patterns of problem behavior.'" *Id.,* at 570, 125 S.Ct. 1183. And in *Graham*, we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." 560 U.S., at 68, 130 S.Ct., at 2026. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.'" *Ibid.* (quoting *Roper,* 543 U.S., at 570, 125 S.Ct. 1183).

. . . Because "'[t]he heart of the retribution rationale'" relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult.'" *Graham,* 560 U.S., at 71, 130 S.Ct., at 2028. Nor can deterrence do the work in this context, because "'the same characteristics that render juveniles less culpable than adults'"—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. *Graham,* 560 U.S., at 72, 130 S.Ct., at 2028. Similarly, incapacitation could not support the life-without-parole sentence in *Graham* : Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but "'incorrigibility is inconsistent with youth.'" 560 U.S., at 72–73, 130 S.Ct., at 2029. And for the same reason, rehabilitation could not justify that

> sentence. Life without parole "forswears altogether the
> rehabilitative ideal." *Graham,* 560 U.S., at 74, 130 S.Ct., at 2030.
> It reflects "an irrevocable judgment about [an offender's] value
> and place in society," at odds with a child's capacity for
> change. *Ibid.*

*Id.* at 471-73 (internal footnote and some internal citations omitted). In other words, "*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes," and this reasoning implicates any life without parole sentence imposed on a juvenile. *Id.* at 472.

[20] The *Miller* Court ruled that an offender's youth and its attendant characteristics must be taken into consideration. And in the cases before it, "the mandatory penalty schemes . . . prevent the sentencer from taking account of these central considerations. By removing youth from the balance . . . these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. The Court also emphasizes that life without parole sentences imposed on juveniles are akin to the death penalty itself. Indeed, juvenile offenders who face life in prison will generally serve a *greater* sentence than adults convicted of the same offense(s).

[21] The Court limited its holding to a rule that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. It declined to consider the alternative argument

that the Eighth Amendment requires a categorical bar on life without parole for juveniles, but explicitly noted that

> we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S., at 573, 125 S.Ct. 1183; *Graham*, 560 U.S., at 68, 130 S.Ct., at 2026-2027. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 479-80 (internal footnote omitted).

### Miller and De Facto Life Sentences

[22] While *Miller* was limited to de jure life sentences, the United States Supreme Court has remanded at least one juvenile de facto life case with instructions for the lower court to reconsider "in light of *Miller v. Alabama*." *Bear Cloud v. Wyoming*, 568 U.S. 802 (2012). Moreover, a majority of state supreme courts agree that the holding of *Miller* and its predecessors should be extended to juvenile de facto life sentences. *See Ira v. Janecka*, 419 P.3d 161 (N.M. 2018) (applying *Miller* to aggregate 108-year sentence); *State v. Ramos*, 387 P.3d 650, 660 (Wash. 2017) (applying *Miller* to aggregate 85-year sentence, concluding that it "clearly" applies to "any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early

release based on demonstrated rehabilitation"); *Johnson v. State*, 215 So.3d 1237 (Fla. 2017) (applying *Graham* to 100-year sentence); *State ex. rel Carr v. Wallace*, 527 S.W.3d 55 (Mo. 2017) (applying *Miller* to sentence that would require juvenile to serve 50 years before being eligible for parole); *Steilman v. Michael*, 407 P.3d 313, 319 (Mont. 2017) (applying *Miller* to 110-year sentence), *cert. denied*; *State v. Zuber*, 152 A.3d 197, 211 (N.J. 2017) (applying *Miller* and *Graham* to 110-year and 75-year sentences), *cert. denied*; *Morgan v. State*, 217 So.3d 266 (La. 2016) (applying *Graham* to 99-year sentence); *State v. Moore*, 76 N.E.3d 1127 (Oh. 2016) (applying *Graham* to 112-year aggregate sentence), *cert. denied*; *People v. Reyes*, 63 N.E.3d 884 (Ill. 2016) (applying *Miller* to an aggregate 97-year sentence); *Casiano v. Comm'r of Correction*, 115 A.3d 1031 (Conn. 2015) (applying *Miller* to aggregate 50-year sentence), *cert. denied*; *State v. Boston*, 363 P.3d 453, 457 (Nev. 2015) (applying *Graham* to sentence that would require juvenile to serve 100 years before being eligible for parole); *Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013) (finding, after remand from U.S. Supreme Court, that *Miller* applies to juvenile sentence of "life according to law," meaning that other state statutes made him ineligible for parole); *People v. Caballero*, 282 P.3d 291 (Cal. 2012) (applying *Graham* to sentence of 110 years to life), *cert. denied*.

[23] Additionally, at least three federal courts of appeal have recognized that a sentence expressed as a term of years was a de facto life without parole sentence to which *Miller* and its predecessors apply. *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) (applying *Miller* to aggregate 100-year sentence); *Moore v. Biter*, 725 F.3d 1184, 1190 (9th Cir. 2013) (applying *Graham* to aggregate 254-year

sentence); *Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017) (applying *Graham* to sentence under which juvenile would not be eligible for parole until he had served 131 years in prison), *cert. denied*.

[24] While our Supreme Court has not squarely considered whether a juvenile who receives a de facto life sentence is entitled to a *Miller* hearing, it has examined *Miller* in another context. In *Brown v. State*, our Supreme Court considered the appropriateness of a 150-year sentence for a juvenile under Indiana Appellate Rule 7(B). 10 N.E.3d 1 (Ind. 2014). Citing *Miller*, the *Brown* Court found that a 150-year sentence for a juvenile is analogous to life without parole, that it "'forswears altogether the rehabilitative ideal,'" and that it was a "'denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison for the rest of his days.'" *Id.* at 8 (quoting, respectively, *Miller*, 567 U.S. at 473, and *Graham*, 560 U.S. at 70). Our Supreme Court revised Brown's sentence to eighty years and did not address the Eighth Amendment.

[25] It is apparent that an abundance of authority across all quarters of our judicial spectrum agrees that *Miller* should be extended to cases in which a juvenile receives a de facto life sentence, whether because of one single lengthy sentence or because of an aggregation of multiple sentences. And in *Brown*, our Supreme Court signaled its agreement that *Miller* does, indeed, apply to such cases. While the State insists that the only thing that matters is the label applied to such cases, arguing that there is a distinction between a life sentence and a 181-

year sentence, it is apparent to us that this is a distinction without a difference. We decline to elevate form over substance in this fashion, especially considering the wealth of authority cautioning that the judicial system must treat juveniles with extra care.

[26] We find that *Miller* applies to sentences for juveniles that amount to a life sentence, regardless of the label applied by the trial court or the State. In other words, if the effect of a sentence is that the juvenile will remain in prison for the rest of his days, with no meaningful opportunity to gain early release based on demonstrated rehabilitation, then that defendant has the right to a *Miller* sentencing hearing.

### *Miller Requirements*

[27] That conclusion, of course, begs the question of what, precisely, is required by *Miller*. The United States Supreme Court explained that its holding required "that a sentence follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, 567 U.S. at 483. More specifically, "we require [the trial court] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. Our Supreme Court agrees, holding that in cases requiring a *Miller* hearing, "both at initial sentencing and on appellate review it is necessary to consider an offender's youth and its attendant characteristics." *Brown*, 10 N.E.3d at 6-7.

[28] It is not enough, therefore, to simply acknowledge the defendant's youth. A *Miller* hearing requires more. While we do not intend to create specific requirements or an exhaustive list, we note that a *Miller* hearing will likely include expert testimony, which would ideally cover both the attendant characteristics of youth in general *and* the particular youth and characteristics of the defendant being sentenced.

### *Did Wilson's Sentencing Hearing Comply with Miller?*

[29] Next, we turn to the sentencing hearing in this case to determine first, whether it complied with *Miller*, and second, if it did not, whether Wilson's trial counsel was ineffective as a result.

[30] Wilson's sentencing hearing comprises only 34 pages of a 767-page transcript. Wilson's attorney presented no evidence on his behalf. The State offered a victim impact statement and one witness, a detective who testified about Wilson's affiliation with gangs and behavior while incarcerated. The sentencing argument made by Wilson's trial counsel takes up only 2 pages of a transcript with over 700, and while counsel mentions Wilson's youth, there was absolutely no argument or evidence regarding the significance of youth and its attendant characteristics, much less Wilson's particular characteristics. We have little difficulty concluding that this hearing did not meet the requirements of *Miller*.

[31] In contrast, at Wilson's post-conviction hearing, his attorney presented multiple witnesses, two of whom testified at length about youth and its attendant

characteristics in general and as related to Wilson, two of whom testified about Wilson's tumultuous and traumatic childhood, and three of whom testified about Wilson's childhood environment and his behavior and character at school. Had the sentencing hearing been more similar to the post-conviction hearing, it cannot be denied that *Miller* would have been satisfied.

[32] At the post-conviction hearing, Wilson's trial attorney testified that he was largely unfamiliar with *Miller* at the time of Wilson's sentencing hearing:

> I wasn't familiar at the time of this case of [the] movement keeping kids from getting sentenced to life without parole. That wasn't even on my radar. Essentially, if he did get convicted in this case, which he did, he would probably get sentenced to life in prison. But it's not like they were trying to give him life without parole. [*Miller*] was not on my radar at all.

PCR Tr. Vol. II p. 15. Counsel also admitted that he did nothing different to prepare for a sentencing hearing for a juvenile client than he would have for an adult client:

> I thought that no matter what I did, nothing was going to essentially change the fact that he was going to die in jail. Judge Vasquez typically gives out separate sentences for each victim. He'll reject the plea if the sentences are concurrent, and I'm well aware of it. I knew he was going to get—he was going to get the murder and the double gang enhancement. And then he was going to get a sentence for the murder, and then a separate sentence for the robbery. My thought going in there is, we're going to do our best, but likely the outcome within a range of 20 to 40 years, is all going to be something between—I ballparked it, I think, like 150 and 200 years, and he was 17. Seventy-five

years, he'll get out when he's 91, minimally. That's where my head was at.

*Id.* at 17.

[33] Counsel acknowledged that at times, even when he suspected a judge would give a harsh sentence, he would present more evidence at sentencing to create a good record for appeal. But in this case, he did not do so. He also did not consider hiring any experts who specialized in child or developmental psychology, mental health experts, or life history investigators. Moreover, while he had not previously represented a juvenile facing a life sentence, he did not reach out to the Indiana Public Defender Council or any other attorneys for resources on or help with representing a juvenile in such circumstances. And although he talked with Wilson's family, he did not call any family members as witnesses and he did not talk with any of Wilson's teachers. Counsel admitted that "[i]t never came across my mind at all" that Wilson should have been evaluated for PTSD even though counsel believed that "a lot of people in gangs have PTSD" and he was aware of Wilson's violence-ridden childhood. *Id.* at 26.

[34] We can only conclude that trial counsel's failure to present any evidence related to youth and its attendant characteristics or to Wilson's own youth, environment, mental health, good character, or prospects of rehabilitation resulted in a hearing that was deficient and non-compliant with *Miller*. In other words, counsel's performance was deficient.

[35]     We can likewise only conclude that the absence of the above-described evidence prejudiced Wilson. The sentencing court cited Wilson's age as the sole mitigating factor, though giving it minimal weight, and found two aggravating factors—Wilson's history of juvenile adjudications and the fact that he had committed multiple offenses involving separate and distinct victims. As noted above, there was a wealth of mitigation evidence available and presented on post-conviction, and we believe that this evidence would have weighed heavily on the mitigating side of the scale. We also note that mitigation evidence is "particularly relevant" for juveniles. *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). We find that there is a reasonable probability that, but for counsel's deficient performance, Wilson would have received a lesser sentence.

[36]     In sum, we find that the post-conviction court erred by finding that Wilson did not receive the ineffective assistance of counsel. Because we resolve the case in this fashion, we need not and will not address Wilson's remaining arguments, including the constitutionality of the criminal gang activity sentence enhancement as applied to him. Should he choose to appeal the sentence imposed after his new sentencing hearing, he is free to raise that argument again.

[37]     The judgment of the post-conviction court is reversed and remanded with instructions to vacate Wilson's sentences and to hold a new sentencing hearing that complies with *Miller*.

Najam, J., and Robb, J., concur.