

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-PC-548

## Donnell Dontrell Wilson

*Appellant (Petitioner Below)*



FILED

Nov 17 2020, 10:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## State of Indiana

*Appellee (Respondent Below)*

---

Argued: November 26, 2019 | Decided: November 17, 2020

Appeal from the Lake County Superior Court,
No. 45G01-1608-PC-7
The Honorable Salvador Vasquez, Judge
The Honorable Kathleen A. Sullivan, Magistrate

On Petition to Transfer from the Indiana Court of Appeals,
No. 18A-PC-3041

---

**Opinion by Justice Massa**

Justices David and Goff concur.

Chief Justice Rush concurs in result.

Justice Slaughter concurs in Parts I and II.A and dissents from Parts II.B and
II.C, with separate opinion.

**Massa, Justice.**

Donnell Wilson was sentenced to 181 years for the murders of Charles Wood and Shaqwone Ham; the lengthy term of years also included a sentence for robbery and a criminal gang enhancement. Wilson, who was sixteen when he committed the crimes, now challenges his sentence on post-conviction review after his conviction was affirmed on direct appeal.

On post-conviction review, Wilson argues his sentence constitutes a *de facto* juvenile life sentence that triggers additional constitutional sentencing considerations under *Miller v. Alabama*, 567 U.S. 460 (2012). He also alleges that both his trial counsel and appellate counsel were ineffective.

After a thorough review of U.S. Supreme Court precedent on juvenile sentencing, we reject Wilson's contention that his sentencing falls under *Miller*. We conclude, however, that his appellate counsel was ineffective on direct appeal when counsel failed to bring an Appellate Rule 7(B) challenge to the appropriateness of Wilson's sentence. Conducting this review now, we reduce Wilson's aggregate sentence to 100 years.

# Facts and Procedural History.

In March 2013, sixteen-year-old Donnell Wilson, his then-girlfriend, her brother Jonte Crawford, and another of the Crawfords' relatives were all walking home from playing basketball in their hometown of Gary, Indiana. When the group encountered fifteen-year-old Derrick Thompson, Wilson and Jonte flashed the handguns they were carrying and began harassing and intimidating Thompson, making references to the local Tre 7 gang. The pair then took Thompson's smartphone and headphones and walked away.

A short time later, the group happened upon brothers Shaqwone Ham and Charles Wood. Wilson and Jonte were members of several interrelated gangs, including the Get Fresh Boys, Tre 7, and Glen Park Affiliated, which were all at odds with the Bottom Side gang, to which Ham and Wood belonged. Wilson had previously argued in person with

the brothers and their disputes had continued online with the brothers threatening to fight Wilson. The groups initially exchanged greetings, but Wilson and Jonte soon began to argue with the brothers. Wilson exclaimed, "Oh, y'all looking for me? I'm in your hood." DA Tr. Vol. 1, p.153. [1] Seconds later, he fatally shot Wood in the head. When Ham tried to run, Jonte shot him several times, killing him too. It is unclear from the record if Wilson also shot at Ham. The brothers were unarmed.

Three hours before the murders, Wilson—who had previously made several gang-related posts on Twitter—sent out a new tweet declaring "Glen Park or get shot," referring to the Gary neighborhood where he lived. DA Ex. Vol. 1, p.43. An hour after the murder, he tweeted "Chillen wit my bros #[GetFreshBoys]." *Id.*, p.42. Jonte and Wilson were quickly arrested, and police found Thompson's possessions on Jonte. Wilson was charged with two counts of murder, Class B felony armed robbery, and a Class D felony conspiracy to commit criminal gang activity. [2] The State also sought a criminal gang enhancement.[3]

While Wilson was lodged in the Lake County Jail awaiting trial, he told his cellmate he killed Ham and Wood because they were affiliated with the rival Bottom Side gang. He also explained how his gang affiliation had led to Twitter disputes with members of the Bottom Side gang. Wilson, along with some fellow inmates, later jumped this cellmate because he was from the "other side of the bridge" dividing Gary. DA Tr. Vol. 2, p.410. During this period, Wilson was also recorded on a jailhouse video conference stating he wanted to "smash" a member of a rival gang incarcerated in the same facility and indicated a desire to continue participating in gang activity. DA Tr. Vol. 4, p.745.

---

[1] "DA" refers to the direct appeal materials from Wilson's original conviction. "PCR" indicates citations to the record in the present post-conviction proceedings.

[2] *See* Ind. Code § 35-42-1-1(1) (2013) (murder); I.C. § 35-42-5-1(1) (Class B armed robbery); I.C. § 35-45-9-3 (conspiracy to commit gang activity).

[3] I.C. § 35-50-2-15 (criminal gang enhancement).

After a four-day trial beginning in June 2014, a jury found Wilson guilty on all counts. The trial court sentenced Wilson to a term of sixty years for the first murder conviction, fifty-five consecutive years for the second murder conviction, six consecutive years for armed robbery, and two years for criminal gang activity, with an additional sixty consecutive years added under the criminal gang enhancement, for an aggregate sentence of 183 years. Wilson's trial counsel did not retain any experts in preparation for the sentencing hearing and did not present any witnesses at sentencing. When handing down the sentence, the court cited several aggravating factors, but found Wilson's youth to be a mitigating factor.

In a separate proceeding, Jonte was initially charged identically to Wilson, but he later pled guilty to a single count of murder and robbery as part of a plea agreement. Jonte's plea deal capped his maximum possible sentence at sixty-five years, and he was ultimately sentenced to sixty-one years of incarceration.

On direct appeal, Wilson challenged his convictions on three grounds, contending that (1) the trial court erred by admitting Twitter messages into evidence without foundation, (2) his conviction for conspiracy to commit criminal gang activity should be vacated because it was duplicative of the gang enhancement, and (3) the trial court erred when it excluded Wilson from a portion of his trial after a violent outburst. The Court of Appeals found in favor of Wilson on the criminal-gang-activity issue and vacated the conviction, thereby reducing his sentence by two years. *See Wilson v. State*, 30 N.E.3d 1264, 1269 (Ind. Ct. App. 2015), *trans. denied.* Wilson's other arguments were rejected, *id.* at 1268–71, and we denied transfer.

Wilson then sought post-conviction relief arguing that—since he was a juvenile—the criminal gang enhancement was unconstitutional as applied to him under both the U.S. and Indiana constitutions. Second, Wilson argued that both his trial counsel and appellate counsel were ineffective. Specifically, Wilson argued that (1) both his trial counsel and appellate counsel should have challenged his 181-year aggregate sentence as a violation of the Eighth Amendment, (2) that trial counsel did not present adequate mitigation evidence at sentencing or properly investigate his

background, and (3) appellate counsel was ineffective for not raising an Appellate Rule 7(B) appropriateness challenge to his sentence.

When the post-conviction court held an evidentiary hearing in March 2018, both Wilson's trial and appellate counsel testified. Trial counsel testified that he met with Wilson five to eight times in jail and that Wilson had rejected a 100-year plea agreement. To prepare for the sentencing hearing, trial counsel talked to Wilson and his family to investigate his background and learn of any mitigating evidence. He also reviewed the pre-sentencing report with his client, which indicated Wilson was not taking any medication and had no history of mental health issues. Based on his review of the records and these conversations, trial counsel concluded there was no need to hire a mental health expert. Further, since Wilson was not facing a life without parole sentence, counsel testified that the U.S. Supreme Court's *Miller v. Alabama* decision—holding that mandatory life-without-parole sentences for juvenile offenders are unconstitutional— "wasn't even on my radar." PCR Tr., p.15.

Wilson's appellate counsel testified that he was unfamiliar with *Miller* at the time of the direct appeal. Instead, appellate counsel homed in on the clear error in the duplicity of the gang activity conviction. But in retrospect, he conceded that he should have also challenged the sentence's appropriateness under Appellate Rule 7(B). Appellate counsel also admitted that, at the time, he was unfamiliar with two recent Appellate Rule 7(B) decisions issued by this Court, both addressing the appropriateness of *de facto* life sentences for juvenile double murderers.

At the post-conviction review hearing, new evidence about Wilson's background was introduced. Dr. Charles Ewing, a forensic psychologist who examined Wilson while in prison, concluded that he was suffering from PTSD linked to growing up in a violent neighborhood where someone once attempted to firebomb his childhood home and where he witnessed the shooting of two friends. Dr. Ewing concluded that Wilson's decision to shoot the victims was based in fear stemming from previous traumatic experiences and that he did not appreciate the consequences of his actions. He also testified that Wilson likely had a good chance of being rehabilitated after he reached age twenty-five. But Dr. Ewing conceded

that Wilson had never previously been formally diagnosed with a mental health issue and a mental health professional only saw Wilson once. The testimony of developmental psychologist Dr. James Garbarino provided a similar positive outlook on Wilson's chances for rehabilitation.

The post-conviction court, however, denied Wilson's petition for relief. The Court of Appeals reversed, finding that Wilson's trial counsel was ineffective when he failed "to present any evidence related to youth and its attendant characteristics or to Wilson's own youth, environment, mental health, good character, or prospects of rehabilitation," as it found was required by U.S. Supreme Court precedent for *de facto* juvenile life sentences. *Wilson v. State*, 128 N.E.3d 492, 502 (Ind. Ct. App. 2019), *vacated*. Ordering a new sentencing hearing, the Court of Appeals declined to address Wilson's other arguments. *Id.* at 503.

The State sought transfer, which we granted.

## Standard of Review.

A post-conviction proceeding is a civil proceeding in which a defendant may present limited collateral challenges to a conviction and sentence. Ind. Post-Conviction Rule 1(1)(b); *Gibson v. State*, 133 N.E.3d 673, 681 (Ind. 2019), *reh'g denied*, *cert. denied*, --- S. Ct. ----, No. 19-8904, 2020 WL 6037221 (Oct. 13, 2020). Potential relief is limited in scope to issues unknown at trial or unavailable on direct appeal. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012) (citing *Pruitt v. State*, 903 N.E.2d 899, 905 (Ind. 2009)). "Issues available on direct appeal but not raised are waived, while issues litigated adversely to the defendant are *res judicata*." *Id.* We do not review a "freestanding claim of error, either 'fundamental' or otherwise," on post-conviction review when it was not raised on direct appeal if the claim was known and available to him. *Stephenson v. State*, 864 N.E.2d 1022, 1029 (Ind. 2007). We have also limited free-standing post-conviction constitutional claims under the Eighth Amendment to only assertions based in "evolving standards of decency, changes in the legal landscape, and the development of a national consensus since [a defendant's previous appeal] such that [the] sentence now constitutes cruel and

unusual punishment." *Baird v. State*, 831 N.E.2d 109, 115–16 (Ind. 2005) (quotation marks omitted).

The defendant bears the burden of establishing his claims by a preponderance of the evidence. P-C.R. 1(5). "When, as here, the defendant appeals from a negative judgment denying post-conviction relief, he 'must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision.'" *Gibson*, 133 N.E.3d at 681 (quoting *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000)). "When a defendant fails to meet this 'rigorous standard of review,' we will affirm the post-conviction court's denial of relief." *Id.* (quoting *DeWitt v. State*, 755 N.E.2d 167, 169–70 (Ind. 2001)).

# Discussion and Decision.

Wilson's claims for post-conviction relief fall into three main branches. First, he argues that his 181-year cumulative sentence amounts to a cruel and unusual punishment under the Eighth Amendment. While Wilson's briefing in the Court of Appeals presented this constitutional argument as both a free-standing constitutional claim and as an ineffective assistance of counsel (IAC) claim, on transfer, he focuses on the IAC rationale. Second, he argues his trial counsel was ineffective for failing to adequately investigate and present mitigation evidence at his sentencing hearing. Third, Wilson argues his appellate counsel was also ineffective because he failed to challenge the appropriateness of the sentence under Indiana Appellate Rule 7(B) on direct appeal. We address each claim in turn.

## I. Wilson's 181-year sentence is not cruel and unusual punishment under the Eighth Amendment.

Wilson originally presented his Eighth Amendment argument as both a free-standing constitutional claim and as an IAC claim based on his counsel's failure to raise the unconstitutionality argument on direct

appeal. These arguments both fail because Wilson's sentencing was appropriate under the Eighth Amendment.[4]

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. To determine what constitutes a cruel and unusual punishment, "courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Graham v. Florida*, 560 U.S. 48, 58 (2010) (citations omitted), *as modified*. "This is because the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment." *Id.* (quotations omitted). What constitutes cruel and unusual punishment changes "as the basic mores of society change." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quotation omitted).

## A. The recent evolution in Eighth Amendment juvenile sentencing requirements.

The U.S. Supreme Court has recently explained how its evolving Eighth Amendment standard should be applied to juvenile offenders. In *Roper v. Simmons*, it held that the Eighth Amendment bars capital punishment for juvenile offenders—which it defined as those who committed the crime before age eighteen. 543 U.S. 551, 578 (2005). Finding that the juvenile offenders were categorically less culpable for their crimes than adults due to their (1) lack of impulse control, (2) heightened vulnerability to negative influences from "outside pressures," and (3) "more transitory, less fixed" personalities, the Court held that juveniles were no longer among the narrow class of "worst offenders" deserving of the death penalty. *Id.* at

---

[4] As we explain in greater detail in Section II below, an IAC claim requires Wilson to prove (1) that his counsel's performance fell short of prevailing professional norms, **and** (2) that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668 (1984). Since we find the 181-year sentence imposed to be constitutional under our current understanding of the Eighth Amendment, Wilson's constitutional IAC claims necessarily fail the second prong of the *Strickland* test because he cannot be prejudiced by his counsel's failure to bring a constitutional argument on direct appeal that we now conclude to be a losing one.

569–70. In the opinion, however, the Court assured the states that life-without-parole sentences would continue to be available for juvenile killers, thereby providing a sufficient deterrent because such a sentence "is itself a severe sanction, in particular for a young person." *Id.* at 572; *see also Conley v. State*, 972 N.E.2d 864, 877–80 (Ind. 2012) (holding that Indiana's scheme of discretionary life without parole sentencing for juvenile murderers—which expressly requires the consideration of aggravating and mitigating factors—is constitutional under both the U.S. and Indiana constitutions).

Echoing *Roper*, the Court soon barred imposing life-without-parole sentences for non-homicide juvenile offenders but allowed the states to develop their own "means and mechanisms for compliance" with its new rule that offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 82, 75. The Court reasoned that the same factors that diminished juveniles' culpability in *Roper* applied to lesser crimes making juveniles "less deserving of the most severe punishments." *Id.* at 68 (citing *Roper*, 543 U.S. at 569). The Court held that life without parole—which it noted was "the second most severe penalty permitted by law" sharing "some characteristics with death **sentences that are shared by no other sentences**"—should not be applied to juvenile "defendants who do not kill" because such defendants are "categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69 (quotations omitted) (emphasis added).

Two years later, the U.S. Supreme Court held that the Eighth Amendment also "forbids a sentencing scheme that **mandates** life in prison without possibility of parole for juvenile [murderers]." *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (emphasis added). Since "juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'" *Id.* at 471 (quoting *Graham*, 560 U.S. at 68). Because "mandatory [life-without-parole] penalty schemes . . . prevent the sentencer from taking [into] account [the] central considerations" of youth, the mandatory life sentences "contravene[d] *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as

though they were not children." *Id.* at 474 (citations omitted). Applying the holding, the Court noted that the sentencing court, "[a]t the least, . . . should look at" the "hallmark features" of youth, the defendant's background, and "the circumstances of the homicide offense" before imposing a discretionary life without parole sentence. *Id.* at 477–78. And, the Court predicted, the "appropriate occasions" for imposing "this harshest possible penalty will be uncommon." *Id.* at 479.

In 2016, the U.S. Supreme Court held that *Miller* "announced a substantive rule of constitutional law," requiring its retroactive application to juveniles sentenced pre-*Miller*. *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016), *as revised*. The opinion required the state to grant the defendant—who was serving a mandatory life without parole sentence for killing a deputy sheriff at age seventeen in 1963—either a new sentencing hearing or parole eligibility. *Id.* at 725, 736. It was the opinion's description of the procedural sentencing requirements imposed by *Miller*, however, that has since created the most debate in courts. The Court in *Montgomery* concluded that *Miller* "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole," explaining that

> [e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

*Id.* at 734 (citations omitted). Despite this language, the Court in *Montgomery* also acknowledged that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility," writing that

states could develop independent procedures to enforce the constitutional requirement. *Id.* at 735.

*Montgomery*'s murkiness has resulted in a split of authority among state high courts as to whether *Miller* requires a court to make a specific factual finding that the juvenile is irreparably corrupt (or permanently incorrigible) before it can issue a life sentence. *See People v. Skinner*, 917 N.W.2d 292, 322 (Mich. 2018) (McCormack, J., dissenting) (observing a "split of authority in state courts post-*Miller* on whether a court must make a specific 'finding' of irreparable corruption"); *see also* Alice Reichman Hoesterey, *Confusion in Montgomery*'s *Wake, Appendix B: Irreparable Corruption Determination*, 45 Fordham Urb. L.J. 149, 190–93 (2017) (listing appellate opinions falling on different sides of the debate).

The U.S. Supreme Court seems poised to better define the scope of *Miller*'s procedural requirements in the near future, as earlier this year it granted *certiorari* on a petition asking the Court to determine if the Eighth Amendment requires the sentencing court to find a defendant to be permanently incorrigible before imposing a sentence of life without parole. *See Jones v. State*, 285 So. 3d 626 (Miss. Ct. App. 2017), *cert. granted*, 140 S. Ct. 1293 (2020).[5] While a decision by the U.S. Supreme Court would certainly clarify some issues, it is unlikely to completely resolve the Eighth Amendment constitutional questions before us because the defendant in *Jones* was sentenced to life imprisonment for a single murder, not a discretionary term of years sentence for multiple offenses like Wilson. *See id.* at 627.

Since *Miller*, a separate split in authority has developed over whether a term of years sentence constitutes a *de facto* life without parole sentence that implicates *Miller*'s procedural sentencing requirements. *Miller* and *Montgomery* both involved juveniles who were sentenced to *de jure* life-without-parole sentences for committing single murders. *Miller*, 567 U.S. at 465–66; *Montgomery*, 136 S. Ct. at 725–26. And the defendant in *Graham* had been sentenced to a *de jure* life without parole sentence for a single

---

[5] The Court heard oral argument in this case on November 3, 2020.

count of armed burglary, with an additional fifteen years for attempted armed robbery. *Graham*, 560 U.S. at 57. So these opinions do not directly address whether the same heightened fact-finding requirements apply directly to discretionary term-of-years sentences.

Recently, many federal circuit courts and state appellate courts have issued opinions on the Eighth Amendment's requirements for *de facto* life-without-parole sentences, falling into three main categories. In the first group are jurisdictions who have held that *Miller*'s required consideration of age and attendant circumstances **is applicable to term-of-years sentences** long enough to be considered a *de facto* life sentence. *See, e.g.*, *Moore v. Biter*, 725 F.3d 1184, 1191 (9th Cir. 2013) (*Miller* and *Graham* apply because the defendant's "sentence of 254 years is materially indistinguishable from a life sentence without parole."); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) ("[A] 52.5–year minimum prison term for a juvenile based on the aggregation of mandatory minimum sentences for second-degree murder and first-degree robbery triggers the protections . . . afforded under *Miller*."); *State v. Ramos*, 387 P.3d 650, 659, 661 n.6 (Wash. 2017) (finding "*Miller* applies equally to literal and de facto life-without parole-sentences[,]" and "[i]t is undisputed that [the defendant's] 85-year aggregate sentence is a de facto life sentence").

The second view finds *Miller* analysis inapplicable to aggregate sentences **that exceed the juvenile's life expectancy**.[6] *See, e.g.*, *United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019) (holding that "a term-of-years sentence cannot be characterized as a *de facto* life sentence[;] *Miller*

---

[6] To be sure, some courts appear to fall somewhere between these categories. The Seventh Circuit, for instance, recently found that "the logic of *Miller* applies" to a *de facto* life 100-year cumulative sentence (50-year murder sentence enhanced by 50 years for use of a firearm). *McKinley v. Butler*, 809 F.3d 908, 911, 909 (7th Cir. 2016). The opinion, however, does not address its previous decision (also authored by then-Judge Posner), considering successive jailhouse disciplinary sanctions, where the court stated that "**every sentence**[ ] must be treated separately, not cumulatively, for purposes of determining whether it is cruel and unusual." *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (emphasis added). It is unclear if the Seventh Circuit's views on sentence aggregation for Eighth Amendment analysis have evolved following *Miller*, or if the two opinions can be harmonized if the 100-year sentence in *McKinley* is viewed as a sentence for one crime: murder with a firearm.

dealt with a statute that specifically imposed a mandatory sentence of life"), *cert. denied*, 140 S. Ct. 1281 (2020); *Bunch v. Smith*, 685 F.3d 546, 547, 553 (6th Cir. 2012) (finding *Miller* inapplicable to an eighty-nine-year aggregate fixed term for robbing, kidnapping, and raping a twenty-two-year-old college student); *Proctor v. Kelley*, 562 S.W.3d 837, 839, 841–42 (Ark. 2018) (holding that a 240-year aggregate sentence—for eleven different robbery counts, none of which would singularly constitute a *de facto* life sentence—does not fall under the purview of *Graham*, which dealt with a life without parole sentence for a single crime), *cert. denied*, 140 S. Ct. 481 (2019); *State v. Helm*, 431 P.3d 1213, 1215 (Ariz. Ct. App. 2018) (refusing to find *Miller* analysis applicable to juvenile serving consecutive murder sentences because "we do not consider the aggregate sentence when conducting a proportionality analysis under the Eighth Amendment" but instead look to the sentence imposed for each specific crime) (citations omitted).

Third, are jurisdictions who have found *Miller*'s requirements **only apply to *de jure* life-without-parole sentences** and therefore are inapplicable to other discretionary sentences, including life with the possibility of parole. *See, e.g.*, *Lucero v. People*, 394 P.3d 1128, 1133 (Colo. 2017) (finding that "the analysis in *Miller* is limited to the sentence at issue in that case, mandatory life without parole, and does not extend to lengthy aggregate sentences or life sentences with the possibility of parole"); *Veal v. State*, 810 S.E.2d 127, 128–29 (Ga. 2018) (upholding six consecutive life-with-parole sentences for rape by juvenile because it found *Miller*'s requirements applied only to *de jure* life-without-parole sentences); *State v. Slocumb*, 827 S.E.2d 148, 156 (S.C. 2019) (holding that since the U.S. Supreme Court declined to also address a term of years sentence in *Graham*, it would hue to the narrow holding that *Miller* and *Graham* only apply to *de jure* life-without-parole sentences). All told, courts around the country are split approximately evenly on whether *Graham* and *Miller* should be extended to at least some *de facto* life sentences. *See Slocumb*, 827 S.E.2d at 156 n.16.

## B. A term of years sentence does not implicate *Miller*.

Given this split in authority, we take counsel in language from *Miller* and *Graham* suggesting their holdings should be read narrowly, absent further guidance from that Court.[7]

*Graham* and *Miller* both explicitly state that their holdings are limited to the "particular" penalty of life without parole. *See Lucero*, 394 P.3d at 1133 (quoting *Graham*, 560 U.S. at 61; *Miller*, 567 U.S. at 483) ("In *Graham*, the Court categorically barred the 'particular' sentence of life without parole for juvenile nonhomicide offenders, saying nothing about consecutive or aggregate sentences. . . . *Miller* likewise speaks only of the sentence of life without parole, calling it a 'particular penalty.'"). The majority in *Graham* explicitly differentiated life-without-parole sentences from other penalties, calling life-without-parole sentences "the second most severe penalty permitted by law [after death,]" and noting that they "share some characteristics with death sentences that are shared by no other sentences." 560 U.S. at 69 (citations omitted). Indeed, dissenting in *Graham*, Justice Alito noted that "[n]othing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole." *Id.* at 124 (Alito, J., dissenting). Likewise, the Court's analysis in *Miller* "distinguished the mandatory sentencing schemes at issue in *Miller* from the impliedly constitutional alternatives whereby 'a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term **with** the possibility of parole or a lengthy term of years.'" *Lucero*, 394 P.3d at 1133 (quoting *Miller*, 567 U.S. at 489). The implication from this distinction is that the holding was not meant to extend to these other types of sentences. *See id.*

---

[7] Due to this holding, we see no need to separately address Wilson's as-applied constitutional challenge to the criminal gang enhancement. To the extent Wilson presents a new constitutional argument differing from the general Eighth Amendment challenge we address above, this novel argument was waived by Wilson's failure to bring it on direct appeal, s*ee Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012), and counsel's failure to advance the argument does not constitute deficient performance, *see Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997).

In fact, in the context of adult offenders, the U.S. Supreme Court has in the past explicitly cautioned against expanding Eighth Amendment protections by relying on general similarities between sentences. In *Harmelin v. Michigan*, an adult defendant was sentenced to a mandatory life without parole sentence for possessing 672 grams of cocaine despite having no prior felony convictions. 501 U.S. 957, 961, 994 (1991). The defendant argued that before the court imposed such a harsh sentence, he should have received an individualized sentencing hearing, equivalent to what is constitutionally required in death penalty cases. *Id.* at 994. Writing for the Court, Justice Scalia acknowledged several similarities between the death penalty and a life without parole sentence, but he found such reasoning by analogy would lead to an ever-expanding category of sentences requiring additional protections. *Id.* at 996 ("It is true that petitioner's [life without parole] sentence is unique in that it is the second most severe known to the law; but life imprisonment **with** possibility of parole is also unique in that it is the third most severe."). Instead, the Court acknowledged it had already "**drawn the line of required individualized sentencing** at capital cases" and chose not to "extend[ ] it further." *Id.* (emphasis added).

The Court later distinguished juvenile life-without-parole sentences from the holding of *Harmelin* because it found life-without-parole sentences to be a categorically more severe punishment for juveniles—both due to the greater amount of time they would likely serve and juveniles' unique characteristics. *See Miller*, 567 U.S. at 480–81. However, *Harmelin*'s core lesson regarding the Eighth Amendment's cruel and unusual punishment clause's constitutional analysis is still valid. That is, determining the reach of the clause is inherently a line drawing exercise best left to the U.S. Supreme Court.

And determining what sentence constitutes a "*de facto* life sentence" would be a task completely unmoored from the language of *Miller*. *See Bunch*, 685 F.3d at 552 ("At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? Would gain time be taken into account? Could the number vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the

number of crimes matter?") (quotation omitted); *Sparks*, 941 F.3d at 754 (noting that an attempt at determining what constitutes a *de facto* life sentence would be a line drawing exercise "not bound by law"). Indeed, well-meaning attempts at fully defining *de facto* life sentences can end up creating requirements that would vastly alter sentencing procedures for a large swath of juveniles. *See United States v. Grant*, 887 F.3d 131, 150–53 (3d Cir. 2018) (proposing a "rebuttable presumption that a non-incorrigible juvenile offender should be afforded an opportunity for release before the national age of retirement" while also requiring trial courts hold a separate hearing to determine an offender's "life expectancy before sentencing him or her to a term-of-years" based on demographic information[8]), *reh'g en banc granted*, *opinion vacated*; *see also Kelly v. Brown*, 851 F.3d 686, 688 (7th Cir. 2017) (Posner, J., dissenting) (arguing, based on third party actuarial data on juvenile prisoners, that a sentence requiring a juvenile to be released after age fifty is a *de facto* life sentence). These examples make clear that any attempt to define a *de facto* life sentence without further guidance from the U.S. Supreme Court would be largely guesswork and would likely require significant (and likely unnecessary) change to Indiana's existing discretionary sentencing scheme.[9]

In sum, "while we are duty-bound to enforce the Eighth Amendment consistent with the Supreme Court's directives," we must interpret this precedent based "upon case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding." *Slocumb*, 827 S.E.2d at 153. As a result, *Miller*'s enhanced protections do not currently apply to Wilson's 181-year term of years sentence. The

---

[8] In addition to the practical implications of such hearings, we would be deeply concerned by the constitutional implications of sentencing someone to a longer sentence based on their immutable characteristics because of life expectancy differences.

[9] While U.S. Supreme Court precedent does not currently apply the *Miller* factors to *de facto* life sentences, trial courts would be well served to explicitly consider the factors relied on by *Miller* before imposing a sentence that would certainly result in a juvenile defendant spending the rest of his life incarcerated. This analysis would likely inoculate their sentencing determinations from further scrutiny if the U.S. Supreme Court expands *Miller*'s reach. Such careful analysis would also serve to better explain why the imposed sentence is appropriate if Appellate Rule 7(B) review is sought.

sentence does not violate the Eighth Amendment because *Miller*, *Graham*, and *Montgomery* expressly indicate their holdings apply only to life-without-parole sentences.

## C. Wilson's sentencing suffices under *Miller*.

Even assuming the standards in *Miller* apply to a *de facto* juvenile life sentence, the judge adequately considered youth and attendant circumstances during sentencing. Since "*Miller* did not impose a formal factfinding requirement," a sentence cannot "be vacated merely because the [sentencing] court failed to quote certain magic words from the Supreme Court's *Miller* decision." *Sparks*, 941 F.3d at 756 (quotation omitted).

While the sentencing judge may not have used the "irreparable corruption" language of *Miller*, he expressly considered Wilson's youth and immaturity as the main mitigating factor throughout sentencing. He also considered the defendant's background—including his three prior referrals to the juvenile justice system and previous conviction for a possession of a dangerous firearm—as evidence of Wilson's corruption. And testimony was presented that even while awaiting trial, Wilson continued to engage in gang activity and expressed that he hoped to "smash" members of a rival gang also incarcerated at the same facility— evidence he was irreparably corrupted. DA Tr. Vol. 4, p.745. While the sentencing judge did not delve into a detailed discussion of Wilson's home environment at sentencing, such a discussion appeared unnecessary based on what the judge knew of Wilson's background at the time because being raised by a stable two-parent family in a bad neighborhood is not a significant mitigator.

The sentencing judge also knew of the gang-centric neighborhood environment to which Wilson was exposed. The victims were members of the rival Bottom Side gang and significant testimony at trial discussed the activities and disputes between these different gangs. Looking at the information considered by the trial judge, as a whole, the sentencing court sufficiently considered Wilson's background, environment and

immaturity before determining that Wilson was sufficiently corrupted and his crimes so serious that he deserved a long term of years sentence.

## II. Wilson's ineffective assistance of counsel claims.

To prevail on his IAC claims, Wilson must show **(1)** that his counsel's performance fell short of prevailing professional norms, and **(2)** that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668 (1984). "A showing of **deficient performance** under the first of these two prongs requires proof that legal representation lacked 'an objective standard of reasonableness,' effectively depriving the defendant of his Sixth Amendment right to counsel." *Gibson*, 133 N.E.3d at 682 (quoting *Overstreet v. State*, 877 N.E.2d 144, 152 (Ind. 2007)). "To demonstrate **prejudice**, the defendant must show a reasonable probability that, but for counsel's errors, the proceedings below would have resulted in a different outcome." *Id.* (citing *Wilkes v. State*, 984 N.E.2d 1236, 1240–41 (Ind. 2013)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

When assessing the counsel's performance, we rely on some basic guidelines. First, we start by strongly presuming that, throughout the proceedings, counsel exercised "reasonable professional judgment" and rendered adequate legal assistance. *Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002). Second, defense counsel enjoys "considerable discretion" when developing legal strategies for a client, demanding deference during judicial review. *Id.* at 746–47. Third, counsel's "[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." *Id.* at 747.

Wilson brings two types of IAC claims. First, Wilson argues that his trial counsel was ineffective when counsel failed to adequately investigate Wilson's background so he could present mitigating and aggravating factors at the sentencing hearing. Second, Wilson asserts that appellate counsel was ineffective for failing to raise significant issues on appeal— including the previously discussed Eighth Amendment constitutional argument—and for failing to seek evaluation of Wilson's 181-year sentence under our inherent revisory authority as part of his direct appeal.

We find his trial counsel's preparation for sentencing were within the bounds of prevailing professional norms. But, given precedent existing at the time, the grounds for relief under Appellate Rule 7(B) should have been significant and obvious to appellate counsel; therefore, we consider and grant 7(B) relief reducing Wilson's sentence to 100 aggregate-years.

## A. Wilson's trial counsel was not ineffective.

Wilson claims his trial counsel was ineffective for failing to investigate and present mitigation evidence at sentencing. Specifically, he contends that his trial counsel should have presented expert testimony regarding the mitigating qualities of youth and conducted a more thorough investigation of Wilson's background, including his mental health history. The post-conviction court made factual findings rejecting these arguments. It concluded that the trial court had conducted an adequate analysis of Wilson's background in line with prevailing professional norms and that trial counsel did not miss the importance of age as the major mitigating factor and had "argued it competently." Appellant's Corr. App. Vol. 2, p.234.

Appealing a factual conclusion by the post-conviction court is an uphill battle requiring Wilson to establish "that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Ben-Yisrayl*, 738 N.E.2d at 258. The evidence here is not that one-sided in Wilson's favor.

Arguing that his trial counsel should have presented expert testimony on how his age reduced his criminal culpability and his prospects for rehabilitation, Wilson cites no evidence that this presentation was required by "prevailing professional norms" in 2014. *See Strickland*, 466 U.S. at 688. In fact, his brief cites only to American Bar Association guidelines, in effect at the time, applicable to the presentation of mitigation evidence in the **death penalty** context. Wilson simply fails to establish that it was standard practice among defense counsel to present such expert testimony at a sentencing hearing for a juvenile facing a lengthy term of years sentence.

Wilson also claims that his trial counsel's sentencing investigation was inadequate because he failed to uncover Wilson's mental health issues—a PTSD diagnosis discovered by experts hired during the post-conviction investigation. We have previously explained that the Constitution does not demand a "scorch-the-earth strategy" in conducting a mitigation investigation. *Ward*, 969 N.E.2d at 56 (quotation omitted). Instead, "[w]hat is reasonable depends on the circumstances of each case, including the facts of the crime, information gleaned from the defendant and others, and other readily available sources of information." *Id.* Here, trial counsel investigated Wilson's background by speaking to members of his family, reviewing the pre-sentencing investigation report with his client and making his own observations about Wilson's mental state during their meetings. The investigative report indicated Wilson had no mental illness. Counsel's interview with family and counsel's own observations did not contradict this evaluation. Because sufficient evidence supports the post-conviction court's conclusion—finding trial counsel's investigation to be adequate—we affirm its holding.

## B. Wilson was provided ineffective assistance of appellate counsel when his attorney failed to seek relief under Indiana Appellate Rule 7(B).

Wilson is entitled to effective assistance of counsel under the Sixth Amendment not only at trial but also on direct appeal. *Timberlake v. State*, 753 N.E.2d 591, 604 (Ind. 2001). These claims are also judged under the two-part *Strickland* test. *Id.* at 603. "Ineffective assistance of appellate counsel claims generally fall into three basic categories: (1) denial of access to an appeal, **(2) waiver of issues**, and (3) failure to present issues well." *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006) (citation omitted) (emphasis added). Wilson argues that appellate counsel failed to raise significant issues on appeal, which falls into the second category.

"To show that counsel was ineffective for failing to raise an issue on appeal thus resulting in waiver for collateral review, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential." *Gallien v. State*, 19 N.E.3d 303, 307 (Ind. Ct.

App. 2014) (citing *Reed*, 856 N.E.2d at 1195). "To evaluate the performance prong when counsel waived issues upon appeal, we apply the following test: **(1)** whether the unraised issues are significant and obvious from the face of the record and **(2)** whether the unraised issues are clearly stronger than the raised issues." *Reed*, 856 N.E.2d at 1195 (quotation omitted) (emphasis added). IAC is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, in part, because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Bieghler v. State*, 690 N.E.2d 188, 193–94 (Ind. 1997). Though instances of successful claims are "very rare," one ground for past successful IAC claims is appellate counsel's failure "to locate[ ] and rel[y] upon" recent precedent from this Court that is "not out-of-date or obscure" and would have directly supported a meritorious argument for relief. *Hopkins v. State*, 841 N.E.2d 608, 614 (Ind. Ct. App. 2006).

Wilson's appellate counsel raised three issues on appeal: (1) whether the trial court properly admitted Twitter messages into evidence, (2) whether Wilson's convictions for conspiracy to commit a criminal gang activity and the resulting enhancement violated double jeopardy, and (3) whether the trial court properly excluded Wilson from the courtroom after an outburst. The Court of Appeals easily affirmed both the admission of tweets and Wilson's removal from the courtroom on direct appeal, and we denied transfer. *See Wilson*, 30 N.E.3d at 1267–71. The Court of Appeals, however, agreed that the conspiracy to commit gang activity charge was impermissibly duplicative and it vacated the conviction and its two-year sentence. *Id.* at 1269. So, Wilson's sentence was only reduced from 183 to 181 years.

Wilson now argues on post-conviction review that his appellate counsel on direct appeal should have brought an independent claim for appellate review under Indiana Appellate Rule 7(B). The rule provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "This appellate review and revise authority derives from Article 4 of the Indiana Constitution, and includes

the power to either reduce or increase a criminal sentence on appeal." *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (quotation omitted) (cleaned up).

At the post-conviction review hearing, Wilson's appellate counsel admitted that in retrospect his appeal strategy was poor. PCR Tr., p.36 ("I saw the clear error in the gang activity [conspiracy] sentence, which surprised me a bit. And I realized, however, that it made virtually no difference in [Wilson]'s sentence. **And I believe I should have gone further and considered more the appropriateness of the sentence** [under Appellate Rule 7(B)].") (emphasis added). In short, appellate counsel himself conceded that an Appellate Rule 7(B) challenge was clearly stronger than the issues he raised on appeal.

Further, counsel conceded that at the time he was unfamiliar with this Court's recent companion decisions reducing long sentences for juvenile double murderers. *See Fuller v. State*, 9 N.E.3d 653, 659 (Ind. 2014); *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014). *Fuller* and *Brown* involved two teenagers—ages fifteen and sixteen years old, respectively—who were convicted of the robbery and murder of an Anderson couple in their own home; both juvenile defendants were originally given 150-year sentences. *Fuller*, 9 N.E.3d at 654–55; *Brown*, 10 N.E.3d at 2–3. However, after reviewing the character of the offenders and the circumstances of their crimes, we found both sentences inappropriate under our Appellate Rule 7(B) discretionary review authority. *Fuller*, 9 N.E.3d at 659; *Brown*, 10 N.E.3d at 8. We reduced their aggregate sentences to eighty-five years and eighty years, respectively. *Fuller*, 9 N.E.3d at 659; *Brown*, 10 N.E.3d at 8. To be sure, Wilson—who also faced an additional gang enhancement—was not necessarily entitled to an identical sentence, but even a cursory reading of *Fuller* and *Brown* shows that the facts of the cases closely track Wilson's crimes and that the reasoning we used to reduce those sentences is also largely applicable to his sentence.

The post-conviction court dismissed Wilson's Appellate Rule 7(B) IAC claim, reasoning that his counsel's failure to bring the claim was harmless because Indiana appellate courts have the power to find a sentence inappropriate *sua sponte.* The court cited as an example our decision in

*Ritchie v. State*, a death penalty appeal, in support of this proposition. 875 N.E.2d 706 (Ind. 2007). In *Ritchie*, we found that "counsel cannot be criticized for failing to raise" an Appellate Rule 7(B) claim on direct appeal because it is "an issue this Court routinely addressed on its own initiative." *Id.* at 724. A close reading of *Ritchie*, however, makes clear that observation is confined to the context of death penalty cases where—prior to later statutory amendments—"this Court as a matter of course reviewed and revised sentences . . . without the need of counsel raising this claim." *Id.*

A few years later, however, we clarified that a request under Appellate Rule 7(B) to "revise a lawfully entered sentence" requires that outside of capital cases the defendant "persuade the appellate court that his or her sentence has met this inappropriateness standard of review." *Kimbrough v. State*, 979 N.E.2d 625, 630 (Ind. 2012) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)) (quotations omitted). Since the defendant in *Kimbrough* "made no such request . . . there was no issue in this regard to be considered by a reviewing court." *Id.* As *Kimbrough* demonstrates, it has not been our custom to *sua sponte* consider a sentence's appropriateness under Appellate Rule (7)(B). We do not generally review a sentence's appropriateness unless prompted by the defendant because this policy allows the defendant to challenge specific parts of trial procedure or his sentencing without risking the possibility the appellate court would find his overall sentence inappropriately low and increase it. *See McCain*, 148 N.E.3d at 985 (noting the appellate court's authority to "either reduce or increase" sentences) (quotation omitted). Any other policy would only chill a criminal defendant's incentive to litigate meritorious appeals.

Despite the high bar required to bring an IAC claim, we find the attorney's failure to bring a claim for Appellate Rule 7(B) constituted deficient performance under *Strickland*. By appellate counsel's own admission, he was ignorant of important recent precedents: *Brown* and *Fuller*—involving juvenile double murderers who also committed armed robbery yet had their sentences significantly reduced. Counsel also conceded he had no other strategic reason for not bringing an argument under Appellate Rule 7(B). Appellate "[c]ounsel should have located and relied upon these cases," and "[w]e also are confident" that had this

authority been presented on direct appeal, the Court of Appeals would have revised Wilson's sentence. *See Hopkins*, 841 N.E.2d at 614. Since requesting review of the appropriateness of a sentence prompts a review "to either reduce **or increase** a criminal sentence on appeal," *McCain*, 148 N.E.3d at 985 (quotation omitted) (emphasis added), we would ordinarily be especially hesitant to second guess an appellate counsel's strategic decision to forgo this review. But Wilson's case is different, because even an upward revision of his sentence by an appellate court would have put him in no worse position since he was already going to die in prison.

In sum, we find that due to the availability of the on-point *Brown* and *Fuller* decisions, a request for review of the sentence's appropriateness had a high likelihood of success. Since the claims appellate counsel brought on direct appeal resulted in an insignificant two-year reduction in Wilson's sentence, his claim for Appellate Rule 7(B) revision was "clearly stronger than the raised issues," as appellate counsel himself conceded. *Reed*, 856 N.E.2d at 1195 (quotation omitted).

"Based on the Indiana authority available at the time of" his sentencing, there is support for Wilson's argument that an appropriateness challenge to his sentence had a high likelihood of success, and his appellate counsel "should have challenged" his aggregate sentence. *Taylor v. State*, 840 N.E.2d 324, 342 (Ind. 2006). "We find that failure to do so amounted to deficient performance," and Wilson "was prejudiced and deprived a fair appeal by his counsel's failure to raise his sentence as an issue." *Id.* The correct remedy for this failure, in this instance, is to give Wilson a new chance to present an Appellate Rule 7(B) claim. But rather than remand for consideration, in the interest of judicial economy, we choose to now conduct a review of the sentence under Appellate Rule 7(B).

## C. Applying Appellate Rule 7(B) to Wilson's sentence.

Examining only the facts available on direct appeal, we conclude that a downward adjustment to Wilson's sentence is appropriate. We modify a sentence only when we find that "the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). "The principal role of [Appellate Rule 7(B)] review should be to attempt to

leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). The point is "not to achieve a perceived correct sentence." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quotation omitted). Rather, "appellate review and revision ultimately boils down to the appellate court's collective sense of what is appropriate." *Brown*, 10 N.E.3d at 8 (quotation omitted). "Whether a sentence should be deemed inappropriate 'turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and [a] myriad [of] other factors that come to light in a given case.'" *McCain*, 148 N.E.3d at 985 (quoting *Cardwell*, 895 N.E.2d at 1224). Because "the number of counts that can be charged and proved is virtually entirely at the discretion of the prosecution[,] . . . appellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell*, 895 N.E.2d at 1225.

At sentencing, Wilson was given (1) an enhanced sixty years for the murder of Charles Wood, which was automatically doubled under the criminal gang enhancement, (2) a consecutive (advisory) fifty-five-year sentence for his role as an accomplice in the murder of Shaqwone Ham, and (3) a minimum six-year sentence for armed robbery. *See Wilson*, 30 N.E.3d at 1267; *see also* Ind. Code § 35-50-2-3 (2013) (providing for a sentence of forty-five to sixty-five years for murder, with a fifty-five-year advisory sentence); I.C. § 35-50-2-5 (providing for a sentence between six and twenty years for a Level 3 felony, with a ten-year advisory sentence).

### i. Nature of the offense.

First, like in *Brown*, "although senseless and reprehensible, . . . there is no evidence that the victims were tortured, beaten, or lingered in pain." 10 N.E.3d at 5. Wilson fired a single gunshot at Wood, instantly killing him, and was an accomplice to Ham's death—who was shot almost simultaneously. Although shocking, these shootings do not rise to the same level of heinousness of recent murders by juveniles where we found an enhanced sentence appropriate. *See, e.g.*, *Conley*, 972 N.E.2d at 876 (finding the heinousness of the murder justified a life without parole sentence for a seventeen-year-old because—while babysitting his ten-year-

old brother—he strangled the young child to death for over twenty minutes while the victim begged him to stop before slamming the victim's head on the concrete to ensure he was dead).

That said, the crime's gang connection justifies an enhanced sentence, and this is accounted for in the mandatory criminal gang enhancement. The General Assembly has found a crime committed as part of gang activity to be deserving of enhanced punishment and enacted a statute that allows for the proportional doubling of "the longest sentence imposed for the underlying felonies." I.C. § 35-50-2-15. The connection to ongoing gang activity here is legitimate grounds for an enhanced sentence. The conduct of Wilson and his gang and their turf wars likely caused significant harm to his neighborhood and was surely especially harmful to other adolescents living there. The sentencing enhancement enacted by the General Assembly more than adequately captures this point. So, the appropriate sentence here will be greater than what we found appropriate for a double murder and robbery in *Fuller*, where the perpetrators were not part of a gang. *See* 9 N.E.3d at 654–55.

### ii.  Character of the offender.

Weighing against Wilson's character is his previous misdemeanor and his actions while incarcerated, but we find these factors to be outweighed by Wilson's age. Wilson's juvenile record is not especially egregious: he was convicted of a single misdemeanor for dangerous possession of a firearm, providing little support for a more severe enhancement. *See, e.g.*, *Prickett v. State*, 856 N.E.2d 1203, 1208–09 (Ind. 2006) (finding that a twenty-one-year-old's juvenile convictions for "incorrigibility, burglary, and theft" were not "weighty enough" or "sufficiently similar" to justify a ten-year enhancement to an adult Class A child molestation conviction).

Wilson's conduct while incarcerated and awaiting trial also evinces that he had learned little following his arrest. In a recorded jailhouse conversation, Wilson stated a desire to "smash" a member of a rival gang incarcerated in the same facility, bragged about the murders to a cellmate, and showed a desire to continue to participate in gang activity. DA Tr. Vol. 4, p.745. These facts weigh against his character.

As we have stated repeatedly, when reviewing the appropriateness of a juvenile's term of years sentence that is so long that it "forswears altogether the rehabilitative ideal" and "means denial of hope," we look closely at "an offender's youth and its attendant characteristics." *Brown*, 10 N.E.3d at 8, 7 (quotations omitted); *Fuller*, 9 N.E.3d at 658, 657 (quotations omitted). Since Wilson was only sixteen, his age is a major factor that requires careful consideration during Appellate Rule 7(B) review. Even though the heightened constitutional requirements in *Miller* and *Graham* were limited by the U.S. Supreme Court to life-without-parole sentences, in *Brown* and *Fuller* we made clear that we are free to apply the developmental science undergirding those cases more broadly through our unique ability to consider a sentence's appropriateness by looking beyond the aggravators and mitigators relied on by the sentencing court. *See Fuller*, 9 N.E.3d at 658 ("Consistent with the Supreme Court's reasoning[,] this Court has not been hesitant to reduce maximum sentences for juveniles convicted of murder."). While we find, just as in *Brown*, that the sentencing court "acted well within its broad discretion in imposing this sentence," 10 N.E.3d at 4, we today—both here and in *State v. Stidham*, No. 20S-PC-634, --- N.E.3d ---- (Ind. 2020) (reducing a 138-year sentence to an aggregate eighty-eight-year sentence)—use our power of independent appellate review and revision under the Indiana Constitution to leaven this outlier based on our review of other similarly situated teenagers who also committed murder.

As noted above, in both *Fuller* and *Brown*, where the defendants' offenses were largely analogous to Wilson's, we reduced each defendant's aggregate sentence to eighty-five years and eighty years, respectively, which means the defendants both have a realistic chance at release by their early sixties. *Fuller*, 9 N.E.3d at 659; *Brown*, 10 N.E.3d at 8. We have made similar reductions in the past even under the old, more deferential "manifestly unreasonable" standard; for instance, we reduced to fifty years a fourteen-year-old's maximum sixty-year sentence for the brutal murder of a seven-year-old girl, recognizing, among other things, his

"very youthful age."[10] *Carter v. State*, 711 N.E.2d 835, 841–43 (Ind. 1999). And in the case of a sixteen-year-old who brutally beat and stabbed his adoptive parents to death while they slept, we reduced a maximum 120–year sentence to eighty years when, along with his mental illness and lack of criminal history, we considered the age of "this offender." *Walton v. State*, 650 N.E.2d 1134, 1135, 1137 (Ind. 1995).

To be sure, lifetime imprisonment may sometimes be appropriate for a juvenile. In *Conley*, for instance, we found a life without parole sentence to be appropriate for the seventeen-and-a-half-year-old who brutally strangled his ten-year-old brother to death while babysitting. 972 N.E.2d at 876–77. We found it appropriate due to the especially heinous nature of the crime, the defendant's lack of significant mental health issues reducing his culpability, and evidence suggesting a "hardened character." *Id.* Although technically not a juvenile, the Court of Appeals similarly considered age and maturity when affirming an aggregate 175-year sentence for a twenty-one-year-old who was convicted of multiple crimes, including murder (as an accomplice) with a gang enhancement, attempted murder, and kidnapping. *Armstrong v. State,* 22 N.E.3d 629, 636, 644–46 (Ind. Ct. App. 2014) (finding defendant's previous six felony and twelve misdemeanor convictions along with the brutal nature of the crime justified an enhanced sentence despite defendant's youth), *trans. denied.*

*Fuller* and *Brown*—as factually analogous cases—provide us baseline sentences (eighty-five- and eighty-year sentences) for what is appropriate for a sixteen-year-old who committed robbery and a double murder. Comparing the nature of Wilson's offense and his character to these cases, we conclude that Wilson's sentence should be reduced to an aggregate 100 years. This includes two concurrent fifty-year sentences for the murders of Wood and Ham, a fifty-year criminal gang enhancement for Wood's murder, and a concurrent six-year robbery sentence. Unlike *Fuller* and *Brown*, Wilson was also convicted of a criminal gang enhancement and we

---

[10] At the time, our appellate rules permitted reviewing courts to revise a sentence if it was "manifestly unreasonable." The current version of Indiana Appellate Rule 7(B), effective January 1, 2003, allows us to revise sentences that are "inappropriate."

must respect the legislature's determination that the corrosive nature of gang activity justifies a higher sentence than what *Fuller* and *Brown* received.

Nevertheless, the main factor weighing in favor of a shorter sentence is Wilson's age. A 100-year sentence means that after receiving good time credit Wilson will likely be eligible for release in his mid-to-late sixties, meaning that he has reasonable hope for a life outside prison. If Fuller, Brown, and Crawford are all able to envision a life outside prison walls, we collectively find it an outlier that Wilson is not provided a similar opportunity and incentive to rehabilitate.

## Conclusion.

We hold that Wilson's original 181-year sentence was not unconstitutional under the Eighth Amendment because the protections outlined in *Miller* for juvenile life-without-parole sentences are inapplicable to a term of years sentence. Furthermore, we find even if the sentence were subject *Miller*'s requirements—that age and attendant circumstances be considered—the trial court's consideration of such factors in the present case was adequate. But we conclude Wilson's appellate counsel performed inadequately when he failed to request appellate review of the sentence's appropriateness under Appellate Rule 7(B). After reviewing Wilson's character and the nature of the offense, we revise Wilson's sentence downward to an aggregate 100 years.

David and Goff, JJ., concur.
Rush, C.J., concurs in result.
Slaughter, J., concurs in Parts I and II.A and dissents from Parts II.B and II.C, with separate opinion.

ATTORNEYS FOR APPELLANT

Amy E. Karozos
Public Defender of Indiana

Katherine Province
Mark S. Koselke
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Stephen R. Creason
Chief Counsel, Appeals Division
Indianapolis, Indiana

Ellen H. Meilaender
Monika P. Talbot
Deputy Attorneys General
Indianapolis, Indiana

**Slaughter, J., concurring in part, dissenting in part.**

I agree with the Court that Wilson's term-of-years sentence does not violate the Eighth Amendment's ban on cruel-and-unusual punishments. To date, the Supreme Court of the United States has not extended its evolving legal standard for juvenile life-without-parole sentences to "de facto" LWOP sentences. Thus, I concur in Part I of our Court's opinion. I also concur in Part II.A of the opinion because I agree that Wilson's trial counsel was not ineffective. But I respectfully dissent from Parts II.B and II.C. I cannot agree that Wilson's appellate counsel was ineffective and that Wilson is entitled to relief under Appellate Rule 7(B).

Until today, we have never held that counsel's failure to raise Rule 7(B) on direct appeal amounts to constitutionally deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984). We adopted Rule 7(B) to effectuate the 1970 amendment to our state constitution's Judicial Article, which (among other things) conferred in our Court the power "to review and revise the sentence imposed" in a criminal case. Ind. Const. art. 7, § 4. Conferring a court with the power to act is not the same as bestowing a defendant with a right to relief. Relief in 7(B) cases is purely a matter of judicial grace. There would be no violation of a defendant's rights—and the defendant would have no judicial recourse—were we to withhold our prerogative under this provision or were the People to amend the constitution and rescind this provision altogether. I would hold as a matter of law that counsel is never deficient for failing to argue that a sentence is inappropriate under Rule 7(B).

The practical effect of today's decision will be to encourage the filing of more claims seeking relief under Rule 7(B), even if there is little or no chance of success, just to avoid the charge that counsel failed to provide the minimal level of competence guaranteed under the Sixth Amendment. At present, there is no shortage of claims seeking this relief. By my count, in 2019 the court of appeals issued 335 written decisions addressing a 7(B) claim, representing nearly one-sixth of its decisions. Of these 335 decisions, 330 denied 7(B) relief; only five found relief under 7(B) to be warranted—a success rate of about 1.5 percent.

Today's decision highlights the need for a workable 7(B) standard, especially considering that 7(B) claims—most of which will fail—require an enormous commitment of appellate resources. As we noted in *Cardwell v. State*, our 7(B) decisions show that "we have not adopted a consistent methodology in reviewing sentences." 895 N.E.2d 1219, 1224 (Ind. 2008) (cleaned up). Yet crafting a consistent method should be, in my view, our primary task. I would give full weight to *Cardwell*'s charge not only to "leaven the outliers," but also to "identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes". *Id.* at 1225. Today we lack such "guiding principles". Our prevailing criteria for identifying and remedying an "inappropriate" sentence are not susceptible to clear judicial standards.

Without a consistent framework for applying 7(B), I would avoid the discretionary review of sentences like Wilson's altogether. Although reviewing and revising trial courts' lawful sentencing decisions are clearly within our constitutional power, exercising this power is not mandatory but discretionary. As our rule says, "[t]he Court **may** revise a sentence". App. R. 7(B) (emphasis added). To be clear, I am not referring to unlawful sentences. If a criminal sentence is unlawful, then of course the aggrieved defendant should receive all the relief available under law. And our appellate courts stand ready to provide such relief. But where, as here, the trial court's sentence was lawful, providing relief under 7(B) amounts to substituting our view of an appropriate sentence for that of the trial judge. Before undertaking the costly process of reconsidering sentencing decisions, I would first provide meaningful "guiding principles" for lower courts. *Cardwell*, 895 N.E.2d at 1225.

For these reasons, I would hold that Wilson's appellate counsel was not ineffective and affirm the trial court's judgment denying post-conviction relief.